IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA STATE AFL-CIO, | : | |
| TRUCK DRIVERS & HELPERS | : | |
| LOCAL NO. 728, UNITED FOOD | : | |
| AND COMMERCIAL WORKERS, | : | |
| LOCAL 1996, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 1:13-cv-03745-WCO |
| | : | |
| SAM OLENS, ATTORNEY | : | |
| GENERAL OF THE STATE OF | : | |
| GEORGIA, JOHN NATHAN DEAL, | : | |
| GOVERNOR OF THE STATE OF | : | |
| GEORGIA, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

This case is about whether a revision and expansion of Georgia's "right-to-work" statute is preempted by the National Labor Relations Act ("NLRA"), as amended by the Labor Management Relations Act ("LMRA" or "Taft-Hartley Act"). The Georgia General Assembly passed House Bill 361 during the 2013 legislative session. (*See* Bill, ECF No. 5-1.) House Bill 361, which is codified in O.C.G.A. §§ 34-6-20 through 26, makes several changes to permissible relationships between state and local governments, employers, employees, and unions.

Plaintiffs, various labor unions, contend that the law is preempted by federal law. Plaintiffs argue that federal labor law has displaced state regulation on the subject and that the law facially conflicts with the NLRA. In response, defendants filed a motion to dismiss [7] seeking to dismiss the complaint in its entirety.

After careful review, the court finds that defendants' motion to dismiss should be granted in part. Defendants' motion is successful to the extent that plaintiffs' complaint challenges the definitions section (O.C.G.A. § 34-6-20), the section listing various federal rights (O.C.G.A. § 34-6-20.1), and a portion of the subsection disallowing "union shop" union-security clauses (O.C.G.A. § 34-6-21(a)). The remainder of the motion fails because defendants incorrectly assume that plaintiffs' complaint is based on field preemption rather than primarily grounded in *Garmon* and *Machinists* preemption. The error renders most of the State's arguments in favor of dismissal inapposite to the resolution of the complex legal issues presented by plaintiffs' complaint.

## I. Brief Overview of the Challenged Act

The Act is comprised of seven sections beginning—logically enough—with definitions. O.C.G.A. § 34-6-20. Next, O.C.G.A. § 34-6-20.1 lists a number of rights that are "protected under federal labor laws." The list includes "[a]n

2

employer's or employee's right to express views in favor of or contrary to unionization" and other labor relations issues, "[a]n employee's right to participate in, and an employer's right to demand, a secret ballot election under federal law," and an employer's right to refuse to go beyond what is required by federal labor law during the collective bargaining process. *See* O.C.G.A. § 34-6-20.1(1-3).

The most significant provisions are located in O.C.G.A. §§ 34-6-21, 25, and 26.

Section 21 declares that no individual "shall be required as a condition of employment or continuance of employment to be or remain a member or an affiliate of a labor organization or to resign from or to refrain from membership in or affiliation with a labor organization." O.C.G.A. § 34-6-21(a).[1] Subsections (b) and (c) stand for the unremarkable proposition that the State, employers, and labor organizations may not invalidate or restrict rights provided by federal law. *See* O.C.G.A. § 34-6-21(b-c). Finally, subsection (d) proclaims that no "employer or labor organization shall be forced to enter into any agreement, contract, understanding, or practice . . . that subverts the established process by which employees may make informed and free decisions regarding representation and

---

[1] This provision is essentially identical to Georgia's original right-to-work statute. *See* O.C.G.A. § 34-6-22 (1947) ("No individual shall be required as a condition of employment or continuance of employment to pay any fee, assessment, or other sum of money whatsoever to a labor organization.").

collective bargaining rights provided for by federal labor law."  O.C.G.A. § 34-6-21(d).

Sections 25 and 26 modify what constitutes a permissible "checkoff authorization" agreement.  A checkoff authorization agreement is an agreement between an employer and employee that allows an employer to deduct union membership dues from the employee's paycheck.  Under federal law, a checkoff authorization must be in writing and "not be irrevocable for a period of more than one year . . . ." 29 U.S.C. § 186(c)(4).  Georgia altered federal law by making it unlawful for an employer to assent to checkoff authorization unless the authorization is in writing and allows the employee to revoke the authorization *at any time*.  O.C.G.A. § 34-6-25, 26.

The final two sections provide that the Act is severable and that all laws and parts of laws in conflict with the Act are repealed.  (*See* Bill 4, ECF No. 5-1).

## II. Structure Governing Facial Challenges and the Evolution of Preemption Issues in Traditional Labor Law

Plaintiffs' suit is a facial challenge.  Facial challenges are generally disfavored. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  A facial challenge "to a legislative Act is, of course, the most difficult challenge to

mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000) ("The general rule in this circuit is that for a facial challenge to be successful, a plaintiff must establish that no set of circumstances exists under which the law would be valid.") (citations, alterations, and internal quotation marks omitted).

Facial challenges are subject to this exacting standard for several reasons. First, claims of facial invalidity "often rest on speculation." *Wash. State Grange*, 552 U.S. at 450. As a consequence, they "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). These challenges "also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* at 450-51 (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring) (internal quotation marks omitted)). Finally, facial challenges may frustrate the intent of the elected representatives of the people by "preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451 (quoting *Ayotte v. Planned*

*Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (internal quotation marks omitted)).  It is for these reasons that a plaintiff mounting a facial challenge to a statute "bears the burden of proving that the law could never be applied in a constitutional manner."  *See Am. Fed'n of State, Cnty. and Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) (quoting *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007)).[2]

A facial challenge fails if the statute in question is "readily susceptible" to a narrowed construction that is constitutional. *Dimmitt v. City of Clearwater*, 985 F.3d 1565, 1572 (11th Cir. 1993).  The fact that a legislative act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  The court must not, however, "rewrite the clear terms of a statute in order to reject a facial challenge." *Dimmitt*, 985 F.3d at 1572.

---

[2] Plaintiffs contend that a facial challenge may also succeed "where a challenged statute does not have a 'plainly legitimate sweep.'"  (Resp. Mot. Dismiss 4, ECF No. 8) (quoting *Wash. State Grange*, 552 U.S. at 450).  This second category of facial challenges applies only to facial challenges based on the First Amendment. *See United States v. Stevens*, 559 U.S. 460, 472 (2010).  The strict "no set of circumstances" test remains the proper standard for evaluating facial challenges for all other cases. *See Scott*, 717 F.3d at 863 (citing *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244, 1255 n.19 (11th Cir. 2012) ("While *Salerno* is often criticized, its holding remains binding precedent, which we faithfully apply here.")).

## A. Labor Law: A Federal Enclave With Limited State Involvement

Adjudicating defendants' motion is impossible without an understanding of the intersection between state and federal limitations on union activity. The resolution of defendants' motion turns on the degree to which federal labor law permits dissonant state labor law. Given that neither party disputes the primacy of federal law over contrary state law, the court will begin by examining the scope of federal law before assessing whether Georgia's law impermissibly encroaches on exclusively federal areas.

In 1935, Congress enacted the National Labor Relations Act. The NLRA established federal labor standards and created the National Labor Relations Board ("NLRB") to implement those standards. As originally enacted, the NLRA permitted union-security agreements that required union membership as a condition of employment. *See NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 738-39 (1963). This arrangement, commonly referred to as a "closed shop," resulted in widespread abuses, so Congress banned the closed shop by passing the Taft-Hartley Act. *Oil, Chem. and Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 414 (1976).

But Congress did not entirely eliminate union-security agreements.  Section 8(a)(3) of the NLRA, codified at 29 U.S.C. § 158(a)(3), permits less restrictive union-security arrangements. *See Gen. Motors Corp.*, 373 U.S. at 740-41.

Three new union-security systems rose to prominence after the demise of the closed shop.  The first is the "union shop" rule.  *See id.* at 742-43.  In this system, all employees *must* join the union after a certain period of time.  *Id.*  The second is the "agency shop" rule, where the employer may hire union or non-union workers, and employees are not required to join the union in order to remain employed.  *See id.* at 736.  Non-union employees must, however, pay a fee to cover collective bargaining costs.[3]  *Id.* at 736-37.  The fee is usually less than the cost of full membership, and the employee is not necessarily placed on the union rolls.  *Id.* at 736 ("[T]he term 'agency shop' applies to an arrangement under which all employees are required as a condition of employment to pay dues to the union and pay the union's initiation fee, but they need not actually become union members.")  The final system is the "open shop" system.  In an open shop, the employee is not required to join or financially support a union as a condition of hiring or continued employment.  *See Black's Law*

---

[3]This fee is meant to address the "free rider" problem where an employee reaps the benefits of union membership without having to pay the costs associated with collective bargaining.  *See Sweeney v. Pence*, 767 F.3d 654, 664-65 (7th Cir. 2014).

*Dictionary* 1384 (7th ed. 1999).  These three union-security agreements were clearly permissible under federal law.

What was not clear was the extent to which states played a role in establishing and enforcing labor standards that restricted or prohibited union-security agreements other than the closed shop.  As a general matter, the NLRA preempts state and local regulation, but the field of labor standards and union regulation is not an exclusively federal arena.  *See, e.g.*, *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 104-05 (1963) (*Retail Clerks II*).  By the time that Congress passed the Taft-Hartley Act, twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and less stringent union-security agreements.  *See Retail Clerks II*, 375 U.S. at 100. Congress' "pervasive regulation of union-security agreements" led some to question whether it intended to preempt the field and put such agreements beyond the realm of state control.  *Id.*  In response, Congress explicitly carved out a limited role for state regulation of labor relations by passing § 14(b).  *Id.* at 104-05.  Section 14(b) states:

> Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor union as a condition of employment in any State . . . in which such execution or application is prohibited by State . . . law.

29 U.S.C. § 164(b).[4]  The inclusion of this provision was no fluke.  Congress inserted § 14(b) to indicate that it "did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements." *See Retail Clerks II*, 375 U.S. at 100; *see also* O.C.G.A. § 34-6-24 ("It shall be unlawful for any employer to contract with any labor organization [and vice versa] so as to require as a condition of employment or continuance of employment that any individual be or remain a member of a labor organization or that any individual pay any fee, assessment, or other sum of money whatsoever to a labor organization.") (1947).

A union-security agreement could pass muster under Section 8(a)(3) but nonetheless fail to be lawful if the agreement did not comply with state law.  *Retail Clerks II*, 375 U.S. at 97-98 ("[Section] 14(b) gives the States power to outlaw even a union-security agreement that passes muster by federal standards.").  This provision clearly illustrates Congress' intent to avoid "completely extinguishing state power over certain union security arrangements."  *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 373 U.S. 746, 751 (1963) (*Retail Clerks I*).  The interplay necessarily creates "conflict[s] between state and federal law; but [they are conflicts] sanctioned

---

[4] Courts generally refer to this section by its traditional numbering.  The court will follow that tradition and refer to the section as § 14(b) even though the section has since migrated to 29 U.S.C. § 164(b).

by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements." *Id.* at 103.

"To summarize, §§ 8(a)(3) and 14(b) together exhaust the federal interest in the types of union-security agreements employers and unions may make. The closed shop is absolutely prohibited. Any lesser security agreement, though consistent with federal interest, is sanctioned only if it harmonizes with state policy." *See Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 427 (1976) (Stewart, J., dissenting).

Section 14(b) is a clear indication that States have the ability to deviate from federal standards in some areas. That grant of authority, however, is limited. Although the NLRA does not reveal "a congressional intent to usurp the entire field" of labor relations, *Brown v. Hotel & Rest. Empls. & Bartenders Int'l Union Local 54*, 468 U.S. 491, 501 (1984), the NLRA has "largely displaced" state-promulgated regulations. *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986). The carveout permits States to regulate only the "execution and enforcement of union-security agreements." *Retail Clerks II*, 375 U.S. at 102. Pre-hiring conduct, for example, remains a province of exclusive federal control. *See id.* at 105; *see also Mobil Oil Corp.*, 426 U.S. at 417 ("Since § 8(a)(3) already prohibits the closed shop, the more restrictive policies that § 14(b) allows the States to enact

11

relate not to the hiring process but rather to conditions that would come into effect only after an individual is hired."); *Laborers' Int'l Union of N. Am. Local No. 107 v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973) (noting that multiple circuits have "squarely held that § 14(b) does not empower states to prohibit nondiscriminatory exclusive hiring halls.").  Most critically, state regulatory power under § 14(b) exists "*only with actual negotiation and execution of the type of agreement described by § 14(b).*" *Retail Clerks II*, 375 U.S. at 105 (emphasis in original).  The State, therefore, cannot use § 14(b) as a source of regulatory authority over labor matters without the presence of a union-security agreement.  *Id.*

## B. Labor-Specific Preemption Doctrines

Even after the consummation of such an agreement, State regulatory authority is curtailed by two labor-specific preemption doctrines: *Garmon* preemption and *Machinists* preemption.

### i. *Garmon* Preemption

States may not police activity that is *actually or arguably within* the purview of the NLRB.  *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959).  *Garmon* concerned "one of the most teasing and frequently litigated areas of industrial relations, the multitude of activities regulated

by §§ 7 and 8 of the National Labor Relations Act." *Id.* at 241. These two provisions govern, respectively, protected "concerted activities" and unprotected unfair labor practices, and courts have been frequently called on to determine "[t]he extent to which the variegated laws of the several States are displaced by a single, uniform, national rule" on what activity falls into which category. *Id.* In *Garmon*, the Court examined whether a California state court could award damages against a union for unfair labor practices during a dispute over a collective bargaining agreement.

The Court recognized the primacy of federal law and that it was "essential to the administration of the Act" that determinations of what constituted "concerted activity" or unfair labor practices "be left in the first instance to the National Labor Relations Board." *Id.* at 244-45. States must "yield to the primary jurisdiction of the National Board" and lack jurisdiction to regulate activity that is *actually or arguably* within the purview of the NLRB. *See id.* The Court provided two narrow exceptions to this otherwise extraordinarily broad edict. First, States retained the right to use their police power to prohibit violent conduct and establish minimum terms of employment. *Id.*; *see also Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 21 (1987) (cautioning that "preemption should not be lightly inferred" when a state legislates "minimum terms of employment" because "the establishment of labor standards falls within the traditional police power of the State"). Second, the NLRA

13

did not abridge the States' authority to regulate conduct that touches "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *See id.* Otherwise, NLRB-monitored activity remains outside the reach of state control.

The case appears to be a sweeping pronouncement that totally walls off sections 7 and 8 of the NLRA from state influence and—at first glance—appears difficult to square with § 14(b). The interaction between the two is not a novel issue; the Supreme Court explained the intersection between *Garmon* and § 14(b) in *Retail Clerks II*.

In *Retail Clerks II*, the Court addressed whether the Florida courts, rather than solely the NLRB, could enforce Florida's prohibition against an "agency shop" clause in a collective bargaining agreement.  The Florida Supreme Court held that such an agreement violated the State's "right-to-work" law and that the state courts have jurisdiction to provide a remedy for that violation.  The Supreme Court agreed.  The Court recognized a conflict between state and federal law but could not condemn it because it was a "conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements." *See Retail Clerks II*, 375 U.S. at 103.

The Court recognized that affirming the Florida Supreme Court's decision appeared to conflict with *Garmon*. The Court reconciled *Garmon* and § 14(b) by determining that *Garmon* did not "state a constitutional principle; it merely rationalizes the problems of coexistence between federal and state regulatory schemes in the field of labor relations; and it did not present the problems posed by § 14(b)." *Id.*

This reconciliation draws a difference between state courts' providing remedies under state law when the same conduct would fall within the jurisdiction of the NLRB and state courts' providing remedies under state law when the conduct is *permissible* according to the NLRA but prohibited by state law promulgated under § 14(b). In other words, it would be nonsensical to permit the states to regulate union-security arrangements like agency shops but bar states from implementing their own laws.

### ii. *Machinists* Preemption

The final piece of this preemption puzzle is *Machinists* preemption. *Machinists* preemption prohibits state and municipal regulation of areas that have been left "to be controlled by the free play of economic forces." *See Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisc. Emp't Relations Comm'n*, 427

U.S. 132, 140 (1976) (*Machinists*).  The doctrine preserves Congress' "intentional balance between the controlled power of management and labor to further their respective interests."  *Building and Const. Trades Council of Metro. Dist. v. Associated Builders and Contractors of Mass.*, 507 U.S. 218, 225 (1993) (quoting *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 614 (1986) (internal quotation marks omitted)).  States may not upset this balance of interests by attempting to "introduce some standard of properly balanced bargaining power" or define "what economic sanctions might be permitted [to] negotiating parties in an 'ideal' or 'balanced' state of collective bargaining."  *Id.* (citation and internal quotation marks omitted).

### iii. Summary

The takeaway from past case law on the intersection between the NLRA and state involvement in labor law is that:

- Federal law sets the floor.  Certain arrangements, like requiring union membership as a condition of employment, are flatly prohibited.

- States have the right to prohibit and impose additional limitations on union-security agreements.

- But the State's ability to deviate from federal labor law is cabined to union-security devices. Pre-hiring arrangements and activity that is arguably or actually within the purview of the NLRB remains an exclusively federal enclave.

• Other aspects of labor law remain entirely free from state and federal lawmaking.  These areas are governed only by the "free play of economic forces."

## III. Jurisdiction and Characterization of the Claim

Plaintiffs characterize their preemption claim as one arising under the Supremacy Clause and 42 U.S.C. § 1983.  As a preliminary objection to plaintiffs' complaint, defendants argue that plaintiffs' claims are defective because the Supremacy Clause does not create actionable "rights" under Section 1983. (*See* Mot. Dismiss 7-10, ECF No. 7) (providing authority for the proposition that "[t]he Supremacy Clause does not create rights enforceable under 42 U.S.C. § 1983," and the Supreme Court has repeatedly held that the Supremacy Clause "is not a source of any federal rights" but "only secures federal rights by according them priority whenever they come in conflict with state law.").

Defendants are partially correct.  Preemption claims under the Supremacy Clause are distinct from § 1983 claims.  *See Local Union No. 12004, United Steelworkers of Am. v. Massachusetts*, 377 F.3d 64, 76 (1st Cir. 2004) ("[T]he Supremacy Clause is not itself a source of rights enforceable under § 1983."); *see also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (holding that the Supremacy Clause, of its own force, does not automatically create

17

rights enforceable under § 1983). However, precedent is not as clear as defendants suggest. "The fact that a federal statute has preempted certain state action does not preclude the possibility that the same federal statute may create a federal right for which § 1983 provides a remedy." *Id.* at 107-08. In all preemption cases, the availability of the § 1983 remedy turns on whether the statute, by its terms or as interpreted, creates obligations "sufficiently specific and definite" to be within "the competence of the judiciary to enforce." *Id.* at 108.

The operative question is not whether plaintiffs allege a violation of the Supremacy Clause but, rather, whether plaintiffs can identify a distinct "right" that is protected against government interference. *See id.* at 109. If plaintiffs demonstrate that they are "the intended beneficiar[ies] of a statutory scheme that prevents government interference with the collective bargaining process and that the [NLRA] gives [them] rights enforceable against governmental interference," then they state a claim under § 1983 separate from their Supremacy Clause claim. *See id.*

The NLRA creates distinct, privately enforceable rights. In *Livadas*, the Supreme Court recognized that the "NLRA protects interests of employees and employers against abridgment by a State," and the plaintiff's rights to complete the collective-bargaining process and agree to an arbitration clause were sufficiently definite to permit a § 1983 claim. *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994).

18

The court is unable to distinguish the rights recognized by the Supreme Court in *Livadas* and the rights plaintiffs seek to vindicate in this case. Here, plaintiffs assert their rights to complete the collective bargaining process without state interference and enter into temporarily irrevocable checkoff authorization agreements. These rights are not equivalent to asserting that the NLRA creates unspecified "rights." *Blessing v. Freestone*, 520 U.S. 329, 342 (1997). While plaintiffs' complaint is primarily based on conflict preemption and *Garmon* preemption, there is no basis for finding that *Machinists* preemption, a doctrine implied from the structure of the NLRA, can support a § 1983 claim but that *Garmon* preemption–similarly implicit in the NLRA's structure–cannot. *See Golden State II*, 493 U.S. 103, 112 (1989) ("A rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision is no less binding than a rule that is based on the plain meaning of a statute.").

Defendants' authority to the contrary is distinguishable because, in those cases, various courts found that the litigant attempting to assert the right was not whom Congress intended the provision in question to benefit. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002) (statutes enacted pursuant to Spending Clause do not create private right of action absent "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights"); *Blessing v.*

*Freestone*, 520 U.S. 329, 342 (1997) (child-support eligible mothers do not have an individual right to have the State's child-support program achieve "substantial compliance" with federal law because the standard is "simply a yardstick for the Secretary to measure the *systemwide* performance" of the program). Unlike in those cases, the NLRA is clearly intended to protect employees from State abridgment of federal labor rights except to the extent that Congress extended States regulatory authority by including § 14(b). The NLRA sections identified by plaintiffs focus on the "individuals protected," not the "person[s] regulated," which creates the "implication of an intent to confer rights on a particular class of persons." *See Gonzaga*, 536 U.S. at 283; 29 U.S.C. §§ 157-59. These rights, whether expressly stated in the text of the NLRA, *e.g.*, 29 U.S.C. §§ 157-159, or implied by the structure of the NLRA, *Garmon* and *Machinists* preemption, are sufficient to state a claim under 42 U.S.C. § 1983 because they indicate "a clear prohibition of specific behavior by Federal, State, or local government rather than an 'aspirational' goal or 'yardstick.'" *See Schwier v. Cox*, 340 F.3d 1284, 1291-92 (11th Cir. 2003) (quoting *Gonzaga*, 536 U.S. at 283).[5] Accordingly, defendants' attempt to defeat plaintiffs' § 1983 claim fails.

---

[5] These factors do no more than establish a *presumption* that the statute creates a § 1983 action, but defendants supply no reason to displace the presumption.

The court has jurisdiction to adjudicate plaintiffs' claims. "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights," and a plaintiff who alleges that state regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution must prevail, clearly "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983). Similarly, the court has jurisdiction over plaintiffs' § 1983 claim under 28 U.S.C. § 1331. Therefore, the court has subject matter jurisdiction to adjudicate plaintiffs' claims.

## IV. Georgia's Right-to-Work Law

Before turning to the law, the court begins with a preliminary note. Defendants appear to misapprehend the bases for plaintiffs' complaint; they begin with the assumption that plaintiffs' complaint is not premised on *Garmon* or *Machinists* preemption. (*See* Mot. Dismiss 11 n.2, ECF No. 7). But plaintiffs' complaint is primarily–if not exclusively–based on these two preemption doctrines.[6] Accordingly,

---

[6]For example, it appears clear to the court that plaintiffs are not invoking field preemption when they assert that "the provisions of federal labor law fully occupy the field of regulating conduct prohibited or protected or arguably prohibited or protected" by the NLRA. (*See* Am. Compl. ¶ 47, ECF No. 5). Rather, this allegation clearly tracks the *Garmon* preemption standard, which prohibits the state from regulating conduct actually or arguably within the jurisdiction of the NLRB. Plaintiffs' reference to the "occupation of the field" does not refer to the entire field of labor law but to particular areas within the field of labor law–NLRB jurisdiction or the free play of economic

the bulk of the motion fails to provide a basis for dismissing or trimming the complaint. Defendants' motion failed to address several critical issues, including whether plaintiffs' facial challenge is premature and the questions it presents are best resolved by an as-applied challenge, whether either of *Garmon*'s exceptions to State regulation apply, whether plaintiffs have standing to challenge limitations on *state regulations* of labor law, and whether Georgia's additions to its right-to-work law are valid to the extent they apply to labor disputes outside the NLRB's jurisdiction. At this stage in the proceedings, the court does not deem it necessary to raise the issues *sua sponte* because it would do no more than result in additional delay in an already sluggish case. The court anticipates that the parties may address these questions in subsequent motions or proceedings.

The court will analyze Georgia's modifications to its right-to-work law in sequential order.

### A. Definitions: O.C.G.A. § 34-6-20

This section provides definitions for "employee," "employer," "labor organization," and other terms used in the subsequent section. Plaintiffs' only basis

---

forces–within which the State is attempting to create or enforce regulation. *Accord Retail Property Trust v. United Broth. of Carpenters and Joiners of Am.*, 768 F.3d 938, 957 (9th Cir. 2014) (holding that the Supreme Court had provided "conclusive evidence that the NLRA does not so 'thoroughly occup[y the] legislative field as to make reasonable the inference that Congress left no room for the States to supplement it'") (citations omitted); *see also* 29 U.S.C. § 186(c)(4).

for invalidating this provision is that the legislation is non-severable. (*See* Am. Compl. ¶ 5, ECF No. 5). Their argument clearly fails because the law includes a severability provision. (*See* Act § 6, ECF No. 5-1) ("This Act shall be severable as provided by Code Section 1-1-3 of Official Code of Georgia Annotated.").

## B. List of Federal Labor Rights: O.C.G.A. § 34-6-20.1

The next provision contains a non-exclusive list of rights protected under federal labor law. The section provides that these federal rights include, but are not limited to:

> (1) An employer's or employee's right to express views in favor of or contrary to unionization and any other labor relations issue to the full extent allowed by the First Amendment of the United States Constitution and Section 8(c) of the National Labor Relations Act;

> (2) An employee's right to participate in, and an employer's right to demand, a secret ballot election under federal law, including, without limitation, the full procedural protections afforded by such laws for defining the unit, conducting the election campaign and election, and making any challenges or objections thereto; and

> (3) An employer's right to:

>> (A) Oppose the recognition of a labor organization based solely on reviewing authorization cards absent a secret ballot election conducted in accordance with federal labor laws;

>> (B) Refuse to release sensitive and private employee information beyond the requirements of federal labor laws;

23

(C) Maintain the confidentiality of employee information to the maximum extent allowed by federal labor laws; and

(D) Restrict access to its property or business to the maximum extent allowed by federal labor laws.

O.C.G.A. § 34-6-20.1.  Plaintiffs argue that the inclusion of this provision violates the Supremacy Clause and that Georgia is preempted from delineating or enforcing federal labor rights.  Defendants contend that this section is permissible because it "does not form the basis of a state cause of action."  Plaintiffs retort that the cause of action resides in another section: O.C.G.A. § 34-6-27.  Section 34-6-27 allows "any individual whose employment is affected, or may be affected, by any contract which is declared in whole or in part to be void by any provision of this article" to obtain an injunction, actual damages, costs, and reasonable attorneys' fees.  This provision is not preempted by federal law.  O.C.G.A. § 34-6-27 provides a remedy for individuals whose employment is affected, or may be affected, by any *contract* which is declared in whole or in part to be void by any provision of Article 2.  No part of § 34-6-20.1 provides a basis for voiding any part of a contract, so § 34-6-27 is inapplicable.

Perhaps plaintiffs could conjure an imaginary, enterprising litigant who advanced some tortured reading of the two provisions in an attempt to invalidate a contract, but creating a hypothetical constitutional violation is not equivalent to showing that there are "no set of circumstances" under which this provision is

constitutional.  To the extent that plaintiffs contend that § 34-6-20.1 encroaches on

NLRB jurisdiction, that complaint is best reserved for an as-applied challenge.

### C. Prohibitions on Union Membership and State Regulation: O.C.G.A. § 34-6-21

Section 34-6-21 contains a list of prohibited practices.  The provision states that:

> (a) No individual shall be required as a condition of employment or continuance of employment to be or remain a member or an affiliate of a labor organization or to resign from or to refrain from membership in or affiliation with a labor organization.
>
> (b) No governmental body may pass any law, ordinance, or regulation or impose any contractual, zoning, permitting, licensing, or other condition that requires any employer or employee to waive statutory rights under federal labor laws.
>
> (c) No governmental body may pass any law, ordinance, or regulation that would require, in whole or in part, an employer or multiple employer association to accept or otherwise agree to any provisions that are mandatory or nonmandatory subjects of collective bargaining under federal labor laws, including, but not limited to, any limitations on an employer's or multiple employer association's right to engage in collective bargaining with a labor organization, to lock out employees, or to operate during a work stoppage; provided, however, that the foregoing shall not invalidate or otherwise restrict the application of federal law.
>
> (d) No employer or labor organization shall be forced to enter into any contract, understanding, or practice, written or oral, implied or expressed, that subverts the established process by which employees may make informed and free decisions regarding representation and collective bargaining rights provided for by federal labor laws.

O.C.G.A. § 34-6-21.

### i. Prohibition on Union Shops

Section (a) restates Georgia's original right-to-work law by declaring that "no individual shall be required as a condition of employment or continuance of employment to be or remain a member or an affiliate of a labor organization" and, in the interest of even-handedness, also prohibits contracts that require an individual to "resign from or to refrain from membership in or affiliation with a labor organization."  O.C.G.A. § 34-6-21(a).

Invalidating the first portion of this subsection would be tantamount to invalidating §14(b) of the NLRA. Georgia has the right to ban union shops under § 14(b).  This prohibition is squarely limited to restricting "the execution or application of agreements requiring membership in a labor organization as a condition of employment," so this provision does not exceed the congressional concession found in § 14(b).  Twenty-four states have some form of a right-to-work law with language that is substantively similar to Georgia's.  *See Sweeney v. Pace*, 767 F.3d 654, 663-64 (7th Cir. 2014) (collecting statutes).  "The longevity of many of these statutes, coupled with the lack of disapproval expressed by the Supreme Court," suggests that this provision is an acceptable application of Georgia's right to enact stricter union-security agreement controls.  *See id.* at 663.  Plaintiffs provide no justification for departing from the long line of cases holding that states have the ability to dictate

permissible union-security agreements under § 14(b), and the court perceives no reason to reexamine this clearly established proposition.

The clause prohibiting agreements that require an individual to resign from or refrain from membership in a labor organization, however, falls outside § 14(b) because it does not regulate union-security agreements. *See Mich. State AFL-CIO v. Callaghan*, 15 F. Supp. 3d 712, 717-19 (E.D. Mich. 2014). The NLRB is empowered to "prevent any person from engaging in any unfair labor practice," and this power includes the ability "to remedy the unfair labor practice of discriminating against union employees or supporters . . . ." *Local 514 Transp. Workers Union of Am. v. Keating*, 358 F.3d 743, 751 (10th Cir. 2004) (finding that a nearly identical provision in an amendment to the Oklahoma Constitution was preempted).[7] Accordingly, plaintiffs stated a viable preemption claim against this subsection to the extent that it seeks to prohibit contracts that require an individual to resign from or refrain from membership in a labor organization.

---

[7] Specifically, the court found that federal law preempted Article XXIII, § 1A(b)(1), which made it a misdemeanor for an employer to require as a condition of employment that any person "resign or refrain from voluntary membership in, voluntary affiliation with, or voluntary financial support of a labor organization." *See Keating*, 358 F.3d at 751 (citations and internal quotation marks omitted).

### ii. Prohibitions on State and Local Regulation

The next two subsections prohibit state and local regulation[8] that would impair or inhibit federal labor rights.

Defendants claim that these two subsections are merely prohibitions on regulation and, therefore, cannot be preempted.  This argument is no basis for dismissal.  There are some areas of labor law where the State cannot tread, and this solitary assertion falls far short of establishing a basis for dismissal.

Because defendants' sole basis for dismissing plaintiffs' challenge to these two subsections is that subsections (b-c) are prohibitions on regulation, the court will allow plaintiffs' challenge to these two subsections to proceed.  The court notes, however, that it has serious concerns about whether a facial challenge could invalidate these two subsections.  These provisions certainly carry the risk for simultaneous State and NLRB inquiries into the same activity—something that the Supreme Court has repeatedly condemned.  *Wis. Dept. of Indus., Labor and Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986) (noting that "conflict is imminent" whenever "two separate remedies are brought to bear on the same activity") (citations

---

[8] The law defines "governmental body" as "the State of Georgia or any local government or its subdivisions, including but not limited to cities, municipalities, counties, and any public body, agency, board, commission or other governmental, quasi-governmental, or quasi-public body, or like capacity of local governments or its subdivision."  O.C.G.A. § 34-6-20(5).

omitted).  But possible unconstitutional action in the future is not enough to sustain a facial challenge.  Plaintiffs should address whether they have standing to challenge these two provisions and, if they have standing, whether these provisions can be invalidated by a facial challenge.

### iii. Subverting Established Processes For Selecting Representation

The final section appears to be clearly prohibited by *Garmon*.  Subsection (d) states that no employer or labor organization shall be forced to enter into a contract "that subverts the established process by which employees may make informed and free decisions regarding representation and collective bargaining rights provided for by federal law."

Immediate flaws are apparent in the provision.  The provision concerns only the collective bargaining process—an area under the exclusive control of the NLRB. Although the states are free to modify what union-security agreements are legal, *see* 29 U.S.C. § 164(b), the process by which the employer and labor organization reach that agreement is outside the purview of state regulation. "When it is clear or may be fairly assumed that the activities which a State purports to regulate are protected by [§§ 7 or 8 of the NLRA], due regard for the federal enactment requires that state jurisdiction must yield." *Garmon*, 359 U.S. at 244.  The determination of whether a

29

given act qualifies as a protected concerted activity or unfair labor practice is the domain of the NLRB, and the state's power and jurisdiction "must yield to the exclusive primary competence of the Board." *See id.* at 245. Accordingly, plaintiffs' challenge to this provision survives defendants' motion.

### D. O.C.G.A. §§ 34-6-25 and 26: Modifications to Checkoff Authorization Agreements

The final two provisions in the law concern checkoff authorization. Checkoff authorization is a union practice where employees sign an agreement authorizing their employer to deduct union dues or other representative fees from their paychecks. Under federal law, the practice is permissible, provided that the checkoff agreement is not irrevocable for a period of more than one year. 29 U.S.C. § 184(c).

Georgia deviates from this federal standard by requiring that checkoff authorizations be terminable at will. Section 34-6-25 precludes an employer from deducting union-related expenses from the earnings of any employee "except on the written authorization of the employee" and requires that the authorization be terminable at will. Section 34-6-26 declares that it is unlawful for any employer to *contract* with any labor organization (or vice versa) to deduct union-related expenses from an employee's earnings without the written authorization of the employee. The provision, like its predecessor, also mandates that the employee is free to revoke the

checkoff authorization at any time.  In short, one provision prohibits the act of deducting wages for union-related expenses (§ 34-6-25) and another prohibits contracting to do so (§ 34-6-26).

### i. Checkoff Authorization Is Not a Union-Security Device, So Georgia May Not Deviate From the Federal Standard

Georgia's modifications to checkoff authorization arrangements survive defendants' motion to dismiss.  Binding authority obligates the court to find that deviations from federal checkoff authorization procedure are preempted and that checkoff authorization agreements fall outside § 14(b).

This is not the first challenge to a state law addressing the validity of checkoff authorizations.  Several cases–mostly originating in the 1970s–have analyzed whether state laws modifying checkoff authorization standards were preempted.  The most relevant of these cases is *SeaPak v. Indus., Tech. and Prof'l Emps., Div. of Nat'l Mar. Union, AFL-CIO*, 300 F. Supp. 1197 (S.D. Ga. 1969) (Lawrence, J.), *summarily aff'd in* 423 F.2d 1229 (5th Cir. 1970), *summarily aff'd in* 400 U.S. 985 (1971).

In *SeaPak*, a corporation sought declaratory relief as to whether a Georgia law mandating the at-will revocation of checkoff authorization was preempted by federal labor law.  *Seapak*, 300 F. Supp. at 1198-99.  The challenged provision disallowed employers from deducting "any fee, assessment, or other sum of money whatsoever"

from the wages or other earnings of any employee without that employee's written authorization. *Id.* at 1198. The employee could revoke the authorization at any time. *Id.* The corporation contended that Georgia's law did not conflict with 29 U.S.C.§ 186, which permits checkoff authorization provided that the authorization may not be irrevocable for a period of more than one year. *Id.* at 1199. Under the corporation's theory, Georgia's at-will checkoff authorization provision was excluded from federal preemption by § 14(b) of the Taft-Hartley Act. *See* 29 U.S.C. § 164(b) ("Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."). The corporation claimed that Georgia's checkoff statute prevented compulsory union membership for employees who signed checkoff authorizations and subsequently left the union. *See SeaPak*, 300 F. Supp. at 1200-01.

The court framed the question as whether "there is a Federal preemption of checkoff authorizations" and whether state law could enact checkoff provision conditions contrary to what is provided for in federal law. *Id.* The district court viewed the two statutory provisions as "completely at odds" and held that Georgia's statute must cede to federal labor law. *Id.* at 1200. After reviewing the Act's

legislative history, the court determined that "Congress did not conceive that checkoff of dues for a limited time after an employee's revocation of authorization" would amount to compulsory union membership.  *Id.* at 1200-01.  The court found that Congress intended §164(b) to extend only to forms of union security that are "the practical equivalent of compulsory unionism."  *See id.* at 1201 (quoting *NLRB v. Houston Chap. Associated Gen. Contractors of Am., Inc.*, 349 F.2d 449, 453 (5th Cir. 1965)).   The court concluded that checkoff authorizations with a one-year irrevocability period were not equivalent to "compulsory unionism," so the court found in favor of the labor organization.

*Seapak* remains controlling, and defendants' attempts to distinguish the case are unconvincing.  First, defendants argue that "the statute in *Seapak* made payroll deduction authorizations affirmatively unlawful unless the authorizations themselves contained specific language stating they were revocable at will.  In other words, an authorization that fully complied with § 186(c)(4) was affirmatively unlawful under Georgia law."  (Mot. Dismiss 19, ECF No. 7).  This is not a valid distinction.  Both statutes prohibit checkoff authorization agreements unless they are revocable at will.  The analysis does not change if the prior statute required that language to be part of the contract and this statute results in the same practical consequence.

Second, defendants contend that § 186(c)(4) is limited to payroll deductions for "membership dues," so federal law is limited "to the context of membership dues and does not apply when the revoking employee is not a union member or is revoking their authorization as to items other than membership dues." (Mot. Dismiss 19, ECF No. 7). This argument may ultimately reduce the *extent* to which sections 34-6-24 and 26 are preempted, but the argument admits that these sections are at least partially preempted.

Third, defendants state that "federal law does not apply to all employees and employers," and if § 186(c)(4) preempts [these two sections], it does so only with respect to covered employees and employers." (*Id.*). Again, this is a valid argument but no reason to dismiss plaintiffs' preemption claims in their entirety.[9]

Additional authority supports the court's ruling. Both sides proceed from the premise that checkoff authorization agreements are union-security agreements, but binding Fifth Circuit authority suggests that checkoff authorization agreements should not be considered union-security agreements, which would remove them from the State's regulatory domain. *NLRB v. Atlanta Printing Specialties and Paper Prods. Union 527, AFL-CIO*, 523 F.2d 783, 784-86 (5th Cir. 1975).

---

[9] The court will refrain from any limitations on the statute's scope until both parties have had the opportunity to argue in favor or against a narrowing construction.

In *Atlanta Printing*, the circuit court examined whether employees could revoke their checkoff authorization agreements when a previous collective bargaining agreement expired and the employer and labor organization entered into a new one. *Id.* at 784-86. The dispute, not germane for resolving this case, involved which one of two collective bargaining agreements was the "applicable" agreement for establishing the period for the revocation of checkoff authorization. *Id.* at 784.

The relevant holding is that the circuit court found that checkoff authorization agreements *were not* union-security agreements. *See id.* at 786. The court noted that NLRA's provisions that address maintenance of membership clauses are governed by a completely different section from the provision governing checkoff authorization agreements. *Id.* ("The flaw in the union's argument is its underlying assumption that dues checkoff is a union security device."). Likewise, maintenance of membership clauses, which concern whether the agreement establishes a union shop, agency shop, or open shop, have "a totally different purpose and rationale" from checkoff authorization arrangements. *Id.* The circuit court reasoned that the "dues checkoff section of the Act . . . far from being a union security provision, seems designed as a provision for administrative convenience in the collection of union dues." *Id.* The circuit court referred to Supreme Court cases under the Railway Labor Act, which found "no formal relationship between a union-shop arrangement and a checkoff

arrangement" because the "parties can negotiate one without the other, if they are so disposed." *See id.* (quoting *Felter v. So. Pacific Co.*, 359 U.S. 326, 337 (1959)). Ultimately, the circuit court concluded that it was "clear that the dues checkoff provisions are not union security devices but are intended to be an area of voluntary choice for the employee. This is true under the [NLRA] as well as under the Railway Labor Act." *See id.* at 787 (citing *NLRB v. Brotherhood of Railway, Airline, & Steamship Clerks*, 498 F.2d 1105, 1109 (5th Cir. 1974)).

*Atlanta Printing* provides a separate basis for sustaining plaintiffs' challenge to Georgia's checkoff authorization modifications. Because checkoff authorization is not a union-security device, it appears to fall outside the bounds of permissible state regulation. Due to Georgia's own legislation, checkoff authorization necessarily *cannot* be considered a union-security device because any agreement that would require an employee to pay collective bargaining fees would run afoul of its original right-to-work law. *See* O.C.G.A. § 34-6-22. The State has a right to determine *whether* a union can obligate employees to join or contribute to the union but not *how* the dues travel from the employees' paycheck to the union.

Defendants claim that the federal checkoff authorization provision merely sets a limit on how long the checkoff authorization period can be but does not prevent a state from further restricting the period of irrevocability. This argument fails to

recognize that states are generally preempted from regulating in the field of labor

relationship, and there is no authority for the proposition that checkoff authorization

is equivalent to an "agreement requiring membership in a labor organization *as a

condition of employment*."   *See* O.C.G.A. § 34-6-22; *Anheuser-Busch, Inc. v. Int'l

Broth. of Teamsters, Local 822*, 584 F.2d 41, 42 (4th Cir. 1978) ("The checkoff

provision is not a union security device; it is simply an administrative convenience

for the collection of dues.") (citation omitted); *see also Local Joint Executive Bd. of

Las Vegas, Culinary Workers Union Local 226 v. NLRB*, 309 F.3d 578, 584-86 (9th

Cir. 2002) (noting several "significant differences between union security and dues-

checkoff" and recognizing that checkoff authorization agreements can exist "even in

the absence of union security").   Rather, checkoff authorization agreements are

freestanding agreements between the employer and its employees that are separate

from whatever overarching collective bargaining agreement is in place.

Accordingly, the court finds that plaintiffs stated a viable preemption claim

against O.C.G.A. § 34-6-25 and 26.

## V. Conclusion

Defendants' motion to dismiss [7] is **GRANTED in part** and **DENIED in part**.  Defendants successfully defeated plaintiffs' preemption challenge to the definitions section (O.C.G.A. § 34-6-20), section listing various federal rights (O.C.G.A. § 34-6-20.1), and a portion of the subsection disallowing a union shop union-security clause (O.C.G.A. § 34-6-21(a)).  The remainder of the motion fails.

As stated previously, defendants' motion failed to address numerous important questions regarding whether plaintiffs' preemption challenge can ultimately succeed. The parties are encouraged to address the following questions in subsequent proceedings:

- Whether any provision of House Bill 361 can be invalidated by a facial challenge or whether an as-applied challenge is appropriate.
- The impact, if any, of *Garmon*'s exceptions to State regulation of conduct within the NLRB's jurisdiction.
- Whether plaintiffs have standing to challenge limitations on state regulations and, even if they do, whether a challenge to these provisions must be brought as an as-applied challenge.
- Whether plaintiffs contend that House Bill 361 is entirely preempted or preempted only to the extent that it overlaps with the NLRB's jurisdiction.

IT IS SO ORDERED, this 20th day of July, 2015.

s/*William C. O'Kelley*
William C. O'Kelley
Senior United States District Judge

38